COOK v. ROBINSON et al.

(Circuit Court of Appeals, Ninth Circuit. March 18, 1912.)

No. 2,012.

**1.** GARNISHMENT (§ 171*)—QUESTIONS OF LAW OR FACT—MOTION TO DISMISS.

It was not necessary that a garnishee should have rested in order to have moved at the close of plaintiff's case to dismiss the proceedings.

[Ed. Note.—For other cases, see Garnishment, Cent. Dig. § 312; Dec. Dig. § 171.*]

**2.** GARNISHMENT (§ 143*)—GARNISHEE'S ANSWER—EFFECT.

Plaintiff could not claim that it was misled by the answer of a garnishee, where the garnishee's answer to interrogatories propounded by plaintiff set forth the real transaction.

[Ed. Note.—For other cases, see Garnishment, Cent. Dig. § 269; Dec. Dig. § 143.*]

**3.** APPEAL AND ERROR (§ 1010*)—REVIEW—QUESTIONS OF FACT—TRIAL TO COURT—CONCLUSIVENESS.

Where a case is tried to the court without a jury, the court's findings are conclusive on questions of fact, unless there is no evidence to support them.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3979–3982; Dec. Dig. § 1010.*]

**4.** GARNISHMENT (§ 56*)—OWNERSHIP OF FUND—DEPOSITS IN BANK.

R., being indebted to H. and wife, with whom he was conducting certain mining operations, before leaving the mine district with a poke of gold, informed H. and wife that he intended to deposit the gold to their credit, asking the wife where she desired the deposit made and to execute a copy of her signature for that purpose. She gave R. her signature, and directed that he deposit the gold in a bank where he had an arrangement that the bank should take the dust, and give credit at the rate of $17.60 per ounce. R. produced the gold to the vice president and manager of the bank on Sunday, and directed him to weigh it, and deposit the proceeds to the credit of H. and wife in specified amounts, and to issue certificates of deposit to each of them therefor. The vice president placed the poke in the vault, where it remained until the next day, when the bank was garnished in a suit against R. as it was weighing the gold, after which it executed and delivered the certificates of deposit to H. and wife as directed. *Held*, that R. in making the deposit and in contracting for the application of the credit to H. and wife was their agent, and that the dust became their property from the time of the deposit, and was not, therefore, subject to garnishment against R.

[Ed. Note.—For other cases, see Garnishment, Cent. Dig. §§ 110, 111; Dec. Dig. § 56.*]

**5.** PAYMENT (§ 65*)—DEPOSIT IN BANK—ASSENT OF CREDITOR—PRESUMPTION.

A deposit of gold dust in a bank to the credit of a creditor of the depositor being for the creditor's benefit, his assent to the deposit in payment of the debt will be presumed.

[Ed. Note.—For other cases, see Payment, Cent. Dig. §§ 162-175, 196-202; Dec. Dig. § 65.*]

In Error to the District Court of the United States for the Fourth Division of the Territory of Alaska.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

194 F.—48

Action by Henry Cook against C. J. Robinson and the Fairbanks Banking Company, garnishee. From a judgment in favor of the garnishee, plaintiff brings error. Affirmed.

On July 18, 1910, Henry Cook, the plaintiff in error, instituted an action against C. J. Robinson, one of the defendants in error, to recover upon two promissory notes, aggregating $10,000, together with accrued interest. On the same day an attachment issued, and a notice of garnishment was served upon the Fairbanks Banking Company, attaching all moneys, gold, and gold dust in the hands of the Banking Company belonging to Robinson. The garnishee made return that it did not have at the time any gold or gold dust in its hands belonging to Robinson. The plaintiff, not being satisfied with the return, procured on October 18, 1910, an order of court requiring the Banking Company, its officers, and employés to appear and be examined under oath concerning its reply to the notice of garnishment, and on the same date filed in said court allegations and interrogatories to be answered by such company. Issues having been duly formulated by answer of the banking company and reply thereto by plaintiff, a trial was had before the court, which, at the close of plaintiff's testimony and after reciting that the matter came on for hearing upon the application of the plaintiff for judgment against the garnishee, the plaintiff having closed his case, and the garnishee having moved for a dismissal upon the ground of failure of plaintiff to establish his allegations, rendered the following findings of fact and conclusions of law:

"(1) That on and prior to the 17th day of July, 1910, Charles J. Robinson, defendant in the above-entitled action, was indebted to Alice Howard and L. G. Howard, employés of said Robinson, in a sum of money aggregating approximately six thousand dollars ($6,000).

"(2) That on and prior to said day said Charles J. Robinson was indebted to plaintiff, Henry Cook, in the sum of ten thousand dollars ($10,000), with accrued interest.

"(3) That on the 16th day of July, 1910, said Robinson informed said Cook that he was unable to pay said Cook the moneys due to him at that time, and informed said Cook that the gold dust he (the said Robinson) then had in his possession, amounting to five thousand seven hundred ninety-three and $21/100$ dollars ($5,793.21), was to be paid to employés of said Robinson for wages due them.

"(4) That on the 16th or 17th of July, 1910, said Robinson notified the said Howards that the gold dust then in his possession amounting to the sum of five thousand seven hundred ninety-three and 21/100 dollars ($5,793.21) in value was to be paid to them on account of wages due to them, and at that time asked for and received instructions as to the disposition of said gold dust, and was by said Howards instructed to deposit same with the Fairbanks Banking Company at Fairbanks, Alaska, and to accept certificates of the deposit therefor, as follows, to wit: Certificate of deposit to Alice Howard in the sum of $3,150; certificate of deposit to L. G. Howard in the sum of $2,643.21, and said Alice Howard at that time delivered to said Charles J. Robinson for delivery to the Fairbanks Banking Company her signature as required by said Fairbanks Banking Company as a means of identification.

"(5) That thereafter, and on about noon of the 17th day of July, 1910, said Charles J. Robinson delivered all of said gold dust, of the value of five thousand seven hundred ninety-three and $21/100$ ($5,793.21) to J. A. Jackson, cashier of the Fairbanks Banking Company, and had said gold weighed at that time and instructed said Jackson that said gold dust was for Alice Howard and L. G. Howard, and that certificates of deposit therefor were to be issued to said Howards in the following sums, to wit: Alice Howard $3,150; L. G. Howard $2,643.21.

"(6) That, said day being Sunday and a nonbanking day, said gold dust was by said Jackson deposited in the vault of the Fairbanks Banking Company until Monday morning, the 18th day of July, 1910, at which time the gold dust teller took said gold dust from the vault, weighed the same, and ascertained the exact value thereof.

"(7) That thereafter a writ of attachment and notice of garnishment was

served upon the Fairbanks Banking Company in the above-entitled action on behalf of said plaintiff.

"(8) That certificates of deposit for the amount of said gold dust was thereafter made out by the proper officials of the bank in the amounts specified by said Robinson, delivered to said Howards, and were by them thereafter cashed.

"(9) That at the time said garnishment was levied upon said Fairbanks Banking Company no further act or thing was necessary to be done, respecting said gold dust, so far as ascertaining the weight or value thereof was concerned.

"(10) That said gold dust was at the time of the levying of said garnishment on said Fairbanks Banking Company the property of the Howards in the following sums, to wit: Alice Howard $3,150; L. G. Howard $2,643.21—and said Charles J. Robinson had no interest whatsoever in or to said gold dust or any part thereof, and the title thereto had passed to and had been vested in said Howards in the respective sums above set forth, and at the time of said levy of said attachment and notice of garnishment the Fairbanks Banking Company was not indebted to Charles J. Robinson in any sum whatsoever, and did not have in their possession any property of any nature or description belonging to said Robinson, save and except 4,000 shares of the capital stock of the Fairbanks Banking Company, which said stock had been theretofore pledged to said Fairbanks Banking Company to secure a note for $2,956, due and owing from said Robinson to said Fairbanks Banking Company.

## "Conclusions of Law.

"The plaintiff above named is not entitled to any judgment against the Fairbanks Banking Company in any sum whatsoever, and the Fairbanks Banking Company, garnishee defendant, is entitled to an order of this court, dismissing said proceedings at the cost of the plaintiff above named."

The plaintiff excepted to findings 3, 4, 5, 7, 9, and 10, for the reason that there was not sufficient or any evidence to support them, which exceptions were overruled and judgment was rendered against plaintiff and favorable to the garnishee in so far as it pertained to the gold dust in controversy. Writ of error is prosecuted from the judgment. The entire evidence accompanies the record. The evidence adduced material to the controversy is, in substance, briefly stated, as follows:

The only witnesses called were Albert J. Jackson, vice president and manager of the Banking Company, D. B. Neil, the gold dust teller, and Robinson, the defendant. Jackson testified that he met Robinson, at his request by telephone, at the bank on the 17th day of July, 1910, which was Sunday; that Robinson delivered to him a poke of gold containing approximately 330 ounces; that the bank had a standing agreement with Robinson to take his gold dust, the same to be clean, and allow him at the rate of $17.60 per ounce therefor, it being merely a verbal understanding, and the dust in question was taken by witness under that understanding; that the dust was cleaned by the teller between 9 and 10 o'clock on Monday morning, being the following day; that the garnishment was served on the bank on Monday morning after the gold dust had been cleaned, and while it was in the process of being weighed or just after it had been weighed; that after the dust had been delivered to witness on the 17th witness relates that he weighed it up just to check with Robinson's weight, and put it back into the poke again and put it in the vault; that he made no entry in the books of the bank that day with reference to the matter; that witness told Mr. Neil, the teller, but after the garnishment had been served, "that that gold dust was to be made out for Alice and L. G. Howard," and that he "hadn't said anything to him before the garnishment was served." The witness continued, as interrogated: "Q. You notified him that the gold dust was to be what? A. I notified him that the gold dust was the property of Alice and L. G. Howard, and to be entered as such. Q. When did you notify him of that? That was after the garnishment was served? A. After the garnishment was served. I hadn't said anything to him about it before. I was waiting for Mr. Robinson. Q. You were wait-

ing for Mr. Robinson, and you waited until Mr. Robinson got there before there was any entry made in the books at all with reference to any entry so far as either Mr. and Mrs. Howard were concerned. Isn't that true? A. Yes. Q. Now, prior to the time that Mr. Robinson came to the bank on the morning of the 18th, which would be after the service of the notice of garnishment upon your bank, you had not issued a certificate of deposit? A. No. sir. Q. (continuing): To either Mr. or Mrs. Howard, had you? A. No, sir; I had not then. Q. Did you ever issue a certificate of deposit to them? A. Yes, sir; the teller did, Mr. Matheney did. Q. When I say 'you,' I mean the bank. Now, when was that done? A. On the morning of the 18th. Q. Were those certificates of deposit delivered to Mr. and Mrs. Howard? A. Not at that time. Q. Were they ever delivered to them? A. Yes, sir. Q. When? A. I think it was about the middle of September. Q. You held them quite a while. A. I held them quite a while; yes, sir. Q. I will ask you to state whether or not you saw either Mr. or Mrs. Howard on the 17th of July, 1910? A. I did not. Q. Did you see either Mr. or Mrs. Howard on the 18th of July, 1910? A. I did not. Q. Did you have any writing; that is, any written notification from either of them— A. I did not. Q. Did you have any understanding or any agreement of any kind with either Mr. or Mrs. Howard at any time prior to the time that this notice of garnishment was served upon you with reference to this gold dust in question or with reference to any credit that was due them from Mr. Robinson? A. I didn't know the Howards at all. No, sir; I had never heard from them at all. Q. (By Mr. Roth): Going back to the time this gold dust was delivered to you, I will ask you to state just exactly what Mr. Robinson told you at the time he delivered the gold dust to you. A. He gave me the poke of gold dust, and said: 'That is for the Howards. I want that placed to their credit.' I said: 'Do you want me to open an account with them?' He said: 'No; you better give them certificates of deposit.' He then told me, if I remember rightly, that there was $1,350 to go to Alice Howard's credit, and the balance to L. G. Whether he told me that on Sunday himself I couldn't state positively, but he did tell me that the money was for the Howards, to be placed to their credit, and I remember him saying on certificates of deposit for them. Ordinarily, if I had been making them out, I would have done it right then. As it was Sunday, I simply told him to come around in the morning and I would then make the certificates of deposit as he requested. He said: 'I have the signature of Mrs. Howard.' I said: 'That will be all right. You can bring that around in the morning and give it to me.' Q. And that you would attend to it in the morning? A. In the morning when he came around."

On cross-examination the witness continued: "Q. What steps did you immediately take at that time respecting the gold dust? A. After it was served, I remembered distinctly, of course, that Mr. Robinson had told me it was for the Howards, and I then telephoned to Mr. Robinson because I thought it was necessary to let him know what had happened, and, as soon as he came, he went with me to your office to consult with you relative to the matter. Q. What did you do as respects the gold dust immediately after this garnishment was served upon you, as respects Mr. Neil and his handling of the gold dust? A. I told Mr. Neil particularly that that dust was for the Howards, for Alice and L. G. Howard, that it belonged to them. I hadn't said anything to him before, and he would not have known but what it was Robinson's dust. He presumably would have implied that it was. Q. Was there any name on the poke when it was put in the safe? A. I am not positive. I think there was a tag on the poke with C. J. Robinson's name on it. Q. Does he usually attach a tag with his name on it to a poke? A. Yes; he generally does. I think the poke was tagged with the weight and C. J. Robinson's name on. Q. Those tags are put on the pokes solely for the purpose of identification? A. Solely for identification. Of the dust I made no entry. It was simply put in the vault, and I wanted something on the poke to know whose poke it was next morning. * * * Q. And he told you at the time he gave it to you that that gold dust was for the Howards? A. He told me it was for the Howards; yes. Q. You told him to come next morning, and you would give him certificates of deposit

for the Howards? A. I did; yes, sir. * * * Q. How long after the weighing of the gold dust was completed were the certificates of deposit issued? A. Why, practically, right away. Mr. Neil had weighed the gold dust. As I say, after fixing the valuation of the poke, he would then make out what we call a charge slip against the gold dust account and turn it over to the teller. He did so, and turned it over to the teller to make out these two certificates of deposit, which was done by Mr. Matheney. It was done practically the same time. Mr. Matheney might have been busy at that time and might have left that slip lying around on his desk until he was at liberty to make out the certificates of deposit. * * * Q. Did you ever enter any credit on Mr. Robinson's general account in the books of the bank of this gold dust? A. No, sir. Q. Was there ever any entry of it made to Mr. Robinson's credit in the bank? A. No, sir. * * * Q. The sum total of the gold dust that was deposited there was disposed of in your bank by issuing two certificates of deposit payable to Alice Howard for $3,150 and to L. G. Howard for the balance, was it not? A. Certainly. Q. Was that the only credit or only disposition that was made of the gold dust? A. Yes, sir; as the entries were made on our books."

D. B. Neil testified that he was the gold dust teller of the Fairbanks Banking Company; that on the morning of the 18th he took care of the gold dust that had been left in the bank the day before; that he found a poke of gold in the vault with a tag attached marked C. J. Robinson; that he took the dust from the vault and weighed it, the weight being 329.16 ounces; that he did not remember whether he cleaned the dust or not; that he made an entry in the bank books with reference to the dust in the gold dust book to the credit of C. J. Robinson; that at the time he was informed of the service of the garnishment he was working in the gold dust teller's cage, but could not say exactly what he was doing; that he thinks he then had all of Robinson's dust weighed. On cross-examination witness further testified: "Q. Isn't it a fact that just about the time or very shortly after you had made your record that that was the C. J. Robinson gold dust, wasn't it about that time that Mr. Jackson came to you and told you that that dust should be deposited to the Howards, and was not Robinson's gold dust? A. Yes; just shortly after. Yes. Q. Didn't he have you make out slips to be given to Mr. Matheney to make out the certificates of deposit for the specified amounts? A. Yes; I made out teller's checks to the Howards for certificates of deposit. * * * Q. And in this particular instance he came and notified you that that gold dust belonged to the Howards? A. To the Howards; yes, sir. Q. And did you make your record accordingly? A. I did. I corrected my book accordingly. * * * Q. When did you make the amendment, what you denominate the amendment or correction, adding Howard's name to that? A. It was in the forenoon. I couldn't say exactly the time. * * * Q. Did you do it immediately upon Mr. Jackson giving you those instructions? A. Yes, sir; I did it immediately upon Mr. Jackson giving me those instructions. Q. Do you know how long it was after you had weighed the gold dust? A. It couldn't have been very long, more than half an hour, I don't think, something like that."

C. J. Robinson testified that he brought in some gold dust in value about $6,000 from Dome Creek, and left it in the Fairbanks Banking Company's vault on Sunday, the 17th day of July, 1910; that he gave the gold dust to Mr. Jackson, who took it from witness and weighed it, this at the request of witness. Witness then says: "I told him (Jackson) I wanted to open two new accounts. I wanted to place it to the credit of Mrs. (evidently should be Mr.) and Mrs. Howard. Q. You wanted what placed to the credit of Mr. and Mrs. Howard? A. The gold dust. Q. Your gold dust? A. Yes. Q. What did he do? A. He said, 'All right,' took the poke from me, and he said, 'Come around to-morrow and attend to it.' I said: 'All right.' * * * Q. Who is this Mr. and Mrs. Howard? A. They have been in my employ nearly three years, working for me on Dome Creek. Q. What is Howard's name? A. L. G. Q. Did you owe L. G. Howard anything at that time? A. I did. Q. How much did you owe him? A. In the neighborhood of $2,600 or $2,700, I believe. Q. Is that the nearest you can get at it? A. I don't know just the exact amount. Q. What is Mrs. Howard's

name, Alice Howard? A. It is. Q. Did you owe her anything? A. I did. Q. How much did you owe her? A. Some $3,100 or $3,200. I owed her for three years' wages. Q. At that time? A. I did. * * * Q. Did you pay Mrs. Howard anything? A. I have just told you that I paid her nothing. Q. I mean out of this poke of gold? A. I credited her with $3,000. I think it was $3,150 that I credited her with. Q. When? A. In the morning, on Monday morning. Q. What time? A. About 10 o'clock, when I went there, at the time I went there. No; I think it was on Sunday that I gave her the $3,150, and the balance to go to L. G. Howard. I believe it was on Sunday when I told Jackson when I put the poke in there. I told him to give her, I think it was, $3,150, and the balance to L. G. Howard, and on Monday morning I gave him her signature which I had brought in with me for that purpose. Q. You gave who, Jackson? A. Yes. Q. Her signature? A. Yes, sir; I did. Q. Is that money placed to Mrs. Howard's credit, subject to her checks? A. I believe so. No; I told him to place it as a certificate of deposit. Q. Why did you want to give Jackson her signature then? A. When I left the creek, I asked her for her signature, and asked her how she wished her money deposited. That I was going to place this money to her credit. She said: 'All right.' I wanted to know what bank she wanted it in. She said the Fairbanks Banking Company. I asked her how she wanted it deposited. She did not know. I said: 'A certificate of deposit?' She said: 'Yes.' I said then: 'Give me your signature.' I was given it, and I brought it in and I gave it to Mr. Jackson in the presence of Mr. Clark on Monday morning the 18th day of July. * * * The balance of the money in the poke that I brought in was to be placed to his credit, which was done. * * * The balance of the poke was placed to Mr. Howard's credit when I brought it in on Sunday when I first gave it to Mr. Jackson; at least, that is, I presume when he placed it to his credit. I told him then that that is to be placed to the credit of Mr. and Mrs. Howard, and I gave him the signature of Mrs. Howard on the following morning."

In a further examination of the witness he was asked: "Q. Did Mr. Jackson give you a receipt for the gold dust when you took it there? A. No. My instruction to Mr. Jackson was to place to the credit of Mr. Howard— " And later: "Q. Now, you may state in detail, as near as you can remember, just what was said between you and Mr. Jackson about what disposition to make of this gold dust? A. I asked him to weigh my poke and to see how it corresponded with my weight. He done so. And I believe I made the remark: 'You are within five points of my weight.' I said I wanted to open two new accounts with him, the Howards. He said: 'Yes.' After weighing the dust, I said: 'Place to the credit of Alice Howard $3,-150, and the balance to L. G.' He said: 'All right. Come around in the morning and fix it up.' I believe that was about the sum and gist of the conversation between us. * * * Q. Did you tell Mr. Jackson to issue to Mrs. Alice Howard a certificate of deposit for the amount that you speak of? A. Yes; I believe I did, stated that I wished it put in in the nature of a certificate of deposit. Q. That was on Sunday at the time that we have been talking about when you took the gold dust there? A. Yes. Q. Did you tell Mr. Jackson to issue a certificate of deposit for the balance to Mr. L. G. Howard? A. I believe I did. Q. That was the same time? A. That was the same time. Q. In the same conversation? A. Yes. Q. Did Mr. Jackson do that? A. He didn't do it then and there."

Stevens, Roth & Dignan, Metson, Drew & Mackenzie, and E. H. Ryan, for plaintiff in error.

Fink & White, for defendants in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). [1] The first contention of plaintiff is that the garnishee's motion to dismiss the proceedings upon which the judgment is based at the close

of plaintiff's case was tantamount to a motion for a directed verdict, and, the garnishee not having rested its case, the motion should have been denied. The action of the District Court is fully sustained by the case of Bunt v. Sierra Butte Gold Mining Co., 138 U. S. 483, 11 Sup. Ct. 464, 34 L. Ed. 1031, which was an action to recover for personal injuries. There the defendant moved at the close of the plaintiff's case for a directed verdict in its favor, which was granted, and the judgment was affirmed, it being expressly declared that the court rightly directed a verdict for the defendant.

[2] The next contention is that the garnishee having tendered the issue nulla bona, without having pleaded matter in avoidance, it will not be heard to set up the right of the Howards to the proceeds of the gold dust, the subject of the controversy. This contention proceeds upon the hypothesis that Robinson first sold the gold dust to the bank, and that the bank received the proceeds to the credit of Robinson, and that thereafter, if the Howards acquired any interest therein whatever, Robinson transferred such proceeds to them, and that the garnishee cannot avail itself of the fact of such transfer without pleading it. A sufficient answer to this is, if the judgment is to stand, that plaintiff proved defendant's case, and from the showing made he was not entitled to recover as against the garnishee. The plaintiff could not have been misled by the answer for the garnishee's answer to the interrogatories propounded by plaintiff set forth the real transaction.

[3] The third contention relates to the findings of the court. The case having been tried without the intervention of a jury, the court's findings are conclusive of the questions of fact, unless it be that there is no evidence to support them. The rule is that the findings of fact of the court, whether special or general, will not be disturbed if there is any evidence upon which such findings could be made. Stanley v. Supervisors of Albany, 121 U. S. 535, 547, 7 Sup. Ct. 1234, 30 L. Ed. 1000; Hathaway v. First National Bank, 134 U. S. 494, 10 Sup. Ct. 608, 33 L. Ed. 1004; Lehnen v. Dickson, 148 U. S. 71, 73, 13 Sup. Ct. 481, 37 L. Ed. 373; and Dooley v. Pease, 180 U. S. 126, 131, 21 Sup. Ct. 329, 45 L. Ed. 457. It is not contended that the conclusions of law should have been different upon the facts found, but that the facts found are not supported by the evidence.

[4] The proposition that there was first a sale of the gold dust by Robinson to the bank does not seem to us to affect the case vitally. Robinson had been accustomed to take his dust to the bank, and through an understanding between the parties the bank took the dust, and, when weighed, allowed Robinson $17.60 per ounce for it, and credit was given as if Robinson had deposited so much money with the bank. So that under the usual way when Robinson took the dust to the bank he would have received credit for it as cash deposited. There is no evidence in the case tending to show that the gold dust in question was to be treated differently than had been usual theretofore, and we may assume for the purposes of this case that, when the dust was delivered to the manager of the bank by Robinson, a sale took place, leaving only the value to be determined by weighing, that there

was a conversion of the gold dust into money, and that henceforth the parties were dealing with the money, and not the dust. Even upon this premise the real question for consideration is, What did Robinson do with the money? Did he deposit it to his own credit, or did he deposit it to the credit of the Howards to apply to the payment of his indebtedness to them? It is strongly urged that the transaction—that is, what was done—did not amount to an appropriation of the money to the payment of Robinson's indebtedness to the Howards, but was only a deposit with instructions to the bank to make the payments through the issuance of the certificates of deposit, that, therefore, the proposed payments on the part of Robinson to the Howards were yet incomplete, and for what was to be done in the way of issuing the certificates the bank was constituted the agent of Robinson and not of the Howards, and that until the certificates were issued and accepted by the Howards the money remained the property of Robinson, subject to garnishment in the hands of the bank by plaintiff.

It is a principle of law perhaps beyond controversy that "where money is paid by A., into the hands of B., to remain at the disposal of C., the right to that money continues in A. until B. gives and C. takes credit for it, or B. actually pays it to C. Up to this period, B. is the agent of A. only, and A. may countermand the authority to make the payment." Trustees of Howard College v. Pace, 15 Ga. 486. In support of the principle the court quotes from Addison on Contracts, as follows:

"But in all cases where money is sent to one person, to be paid by him to another, to enable the person who is the object of the remittance, to maintain an action against the remittee, to recover the amount transmitted to him, there must be an express promise or assent, on the part of the latter, to pay over the money to the former, or hold it to his use, inasmuch as the mandate is revocable, so long as no such assent, promise, or engagement has been given or entered into"—citing authorities.

Thereupon the court further observes that:

"When, however, the assent has been given, and the attornment made, the order to pay the money, if founded on a precedent debt or other good consideration, becomes irrevocable."

So in a later case in the same court it is held that:

"When A. deposits money in a bank, with directions that it is to be paid out to a check which he has given, or will give to C., the money is still the money of A. until the bank either pays it, or promises C. to pay it, or unless it be deposited at the instance or procurement of C., or under an arrangement with him." Mayer & Lowenstein v. Chattahoochee National Bank, 51 Ga. 325.

The court then proceeds to the exceptions to the rule, about which it says:

"The exceptions to the rule are special cases, as where the person to whom the money is ordered to be paid is interested in the consideration, or has himself procured, or directed, or agreed, that the deposit shall be made for his benefit. In such cases the depositor may be considered only as the agent of the party at interest in making the deposit and in contracting with the bailee for its delivery or payment to the true owner or beneficiary, and he, the depositor, loses control over it immediately on the deposit. In fact, it is not his deposit at all, but left for the true owner as agent."

The principle is reaffirmed in Bluthenthal et al. v. Silverman, 113 Ga. 102, 38 S. E. 344. See, also, Kelly v. Roberts, 40 N. Y. 432; Peak v. Ellicott, 30 Kan. 156, 1 Pac. 499, 46 Am. Rep. 90; Brockmeyer v. Washington National Bank, 40 Kan. 376, 19 Pac. 855; Simonton v. First National Bank of Minneapolis, 24 Minn. 216; and Witter v. Little, 66 Iowa, 431, 23 N. W. 909.

These cases, however, do not seem to meet the conditions here present. The court has found in epitome that Robinson, having certain gold dust in his possession, notified the Howards to whom he was indebted that it was to be paid to them, and at the same time asked and received instructions from them to deposit the same in the Fairbanks Banking Company bank, and to accept certificates of deposit therefor in an amount to each of the Howards as designated; that Robinson delivered the gold dust to the cashier of the bank, had it weighed, and instructed the cashier that it was for Alice and L. G. Howard, and that certificates of deposit were to be issued to the said Howards in sums designated, and that thereafter, the next day, notice of garnishment was served upon the bank attaching Robinson's property in the hands of the bank. These findings show that the Howards were not only not without notice of the intended deposit of the gold dust for their benefit, but that they had assented thereto by instructing Robinson that it be so deposited, and that he take certificates of deposit to be issued to them therefor. This brings the case directly within the exceptions to the rule as laid down in Mayer & Lowenstein v. Chattahoochee National Bank, supra. The Howards themselves agreed and directed that the deposit should be made for their benefit. In such a case under the exceptions the depositor bcomes the agent of the party for whose interest it is made, and he loses control over the deposit immediately it is made. When the deposit is made, the bank would thereupon become the agent of the party at interest. The dust had been deposited for the Howards, and the fact that the certificates of deposit were not issued to them at once did not change the relationship between them and the bank. The ownership of the dust or the money in its converted state immediately the deposit was made became the property of the Howards, and the bank's further duty in issuing the certificates of deposit was to the Howards, the same to be delivered to Robinson as their agent.

Now, as to whether there was any evidence to support the facts found by the court, Robinson says, in effect, that he owed the Howards for services, giving the amount approximately due to each; that when he left the creek—that is Dome Creek, where he was engaged in mining—he asked her, Mrs. Howard, for her signature, and how she wanted her money deposited, and stated that he was going to place this money to her credit; that she said all right, and further stated that she wanted it in the Fairbanks Banking Company's bank, and a certificate of deposit for it, and then gave Robinson her signature to be handed to the bank. Jackson's testimony is to the effect that Robinson delivered him the poke of gold and said that it was for the Howards, that he wanted it placed to their credit, and that the bank should issue certificates of deposit to them. The certificates were not then

made out, but would have been if it had not been on Sunday, a non-banking day. This is ample to support the findings of fact, at least as it pertained to Mrs. Howard.

[5] As it relates to Howard, the garnishee in its answer to plaintiff's interrogatory further states that:

"Mr. Robinson stated at the time that he had told the Howards that he was going to deposit the money to their credit under certificates of deposit."

This affords some evidence of Howard's assent to the deposit of the gold dust in payment of the debt due him although by nature hearsay, and perhaps self-serving. But without this, Howard being a creditor and the deposit being made in payment of Robinson's debt to Howard, the assent of Howard to the payment will be assumed.

It was said in Grove v. Brien, 8 How. 429, 439, 12 L. Ed. 1142, that:

"In the absence of all evidence to the contrary in case of an absolute assignment by a debtor to his creditor for the purpose of securing a pre-existing debt, an assent will be presumed on account of the benefit that he is to derive from it,"

—citing in support thereof Tompkins v. Wheeler, 16 Pet. 106, 10 L. Ed. 903, and Brooks v. Marbury, 11 Wheat. 78, 6 L. Ed. 423.

The Tompkins Case was where the debtor made a deed of assignment for the benefit of a part of his creditors only, and the court held that the presumption of law was that the grantees accepted the deed; and the Brook Case was analogous and attended with a like holding. If this is true in case of an assignment to secure a debt, it must also be true in case of a payment of the debt to a third party for the benefit of the creditor.

These considerations lead to an affirmance of the judgment of the District Court, and it is so ordered.